# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

**UNITED STATES OF AMERICA**                **CRIM NO. 3:22CR61 (VLB)**

      **v.**

**JAMIE PETRONE**                          **October 7, 2022**

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

For nearly a decade, Jamie Petrone lived a life most cannot even fathom. She paid cash for several homes in Connecticut and Georgia. She drove expensive cars, including a Range Rover worth more than $100,000, and bestowed them on friends and family. She spent millions on fancy vacations for herself and others, luxury personal goods, VIP concert tickets, and spa treatments.

But Petrone did not come by her opulent lifestyle honestly. Instead, she financed her lavish spending by quietly and consistently robbing Yale University School of Medicine ("Yale Med") of more than $40 million over almost a decade and cheated the United States Treasury out of more than $6 million by lying on her tax returns. Her scheme was, at base, a violation of trust. As a longtime employee of Yale Med's Department of Emergency Medicine, Petrone was (by Yale's own estimation) a member of the Yale family, promoted through the ranks to become the department's lead administrator. In that capacity, she was afforded a great deal of responsibility in furthering the department's mission to serve patients and support health care providers. But Petrone instead used Yale's trust to her own financial advantage, placing tens of millions of dollars in fraudulent computer equipment purchases that she then sold for cash. Even as the world around her

was devolving into a COVID-19-induced nightmare, and the healthcare system was taxed as never before, Petrone accelerated her criminal scheme and compounded the betrayal of her Yale family. Accordingly, the Court should sentence Petrone within the advisory Guidelines range of 97 to 121 months of imprisonment.

I.    Introduction and Background

A.    Procedural History

On September 3, 2021, Jamie Petrone was arrested pursuant to criminal complaint, charging her with mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, and money laundering in violation of 18 U.S.C. § 1957.  Petrone appeared before United States Magistrate Judge Robert M. Spector and was released on a $1 million bond secured by five real properties owned by Petrone or friends of Petrone.  After several preliminary hearing continuances to facilitate a resolution of this matter, on March 28, 2022, Petrone appeared before United States Magistrate Judge Donna F. Martinez and pleaded guilty to a two-count information charging wire fraud in violation of 18 U.S.C. § 1343 and filing a false tax return in violation of 26 U.S.C. § 7206(1).  Petrone's plea was pursuant to a plea agreement that, among other things, included a Sentencing Guidelines stipulation in which the parties agreed that the advisory sentencing range is 97 to 121 months' imprisonment.  Petrone agreed to restitution in the amount of $40,504,200.08 to Yale University and $6,416,618.00 to the Internal Revenue Service. Petrone also agreed to forfeit her interest in a bank account and several automobiles, and to allow the liquidation of three properties in advance of (or after) sentencing.  Finally, Petrone waived appeal so long as her sentence does not

exceed 121 months of imprisonment, a 3-year term of supervised release, a $200 special assessment, a $300,000 fine, $40,504,200.08 in restitution under Count One, $6,416,618.00 in restitution under Count Two, and forfeiture as described in the Information.

     B. <u>Summary of the Facts</u>

     A fulsome summary of the offense conduct is set out in the PSR at ¶¶ 7-31, which the Government incorporates by reference and substantially restates or summarizes here.

     Petrone was employed by the Yale University School of Medicine ("Yale Med"), Department of Emergency Medicine, in New Haven, Connecticut, beginning in approximately 2008.  Petrone had previously worked in other areas of Yale Med and Yale New Haven Hospital since 1999.  Since September 1, 2019, Petrone was Lead Administrator and Director of Finance and Administration for the Department of Emergency Medicine; prior to that, Petrone held other administrative positions within the Department of Emergency Medicine beginning in 2008.  As part of her job responsibilities, Petrone had authority to make and authorize certain purchases on behalf of the Department of Emergency Medicine for departmental needs.  So long as the purchase amount stayed below $10,000, Petrone did not need further authorization within the Yale purchasing structure.

     Beginning at least as early as 2013, and continuing through August 2021, Petrone devised and executed a scheme and artifice to defraud Yale University and Yale Med, and to obtain money and property of Yale University and Yale Med by means of false and fraudulent pretenses, representations, and promises, wherein

3

she caused Yale Med to order unnecessary computer equipment that Petrone stole and then sold to out-of-state resellers.

As part of the scheme and artifice, Petrone ordered, and caused others working for her to order, large amounts of electronic hardware from Yale vendors using Yale Med funds.  The hardware included Microsoft Surface Pro 2-in-1 detachable tablet computers, Apple iPad tablet computers, Apple MacBook computers, and cameras and camera equipment.  Additionally, Petrone ordered preloaded applications for some of the equipment and extended warranties. Petrone typically broke up purchases into several orders below the $10,000 threshold so as to avoid the need for additional approval.  As discussed below, Petrone often ordered the equipment to satisfy the requests of the companies to which she would ultimately resell the goods.

Petrone often falsely represented on Yale internal forms and in electronic communications to other Yale personnel that the hardware was for specified Yale Med needs, such as particular medical studies, when in truth Petrone intended to resell and profit from the hardware.  On many occasions, Petrone doctored emails from more senior Yale personnel to make it appear that those personnel were requesting that the hardware be ordered, when in fact no such request had been made.  For example, on January 10, 2018, Petrone sent an email to a more senior Yale employee in response to a January 8 email from that employee requesting her bio and forwarding a description of a conference at which the employee would be presenting.  No reference was made to ordering computers.  On January 9, 2018, Petrone put in a purchase order for iPads in which she transcribed as an

4

"Internal Memo" the same January 8 email from the employee requesting the bio. In the transcription, however, Petrone added a new line to the employee's email: "Please order 50 ipads for these screenings."  This was not in the employee's original email but was added by Petrone in order to justify the purchase order. This was one of many doctored emails used as false justification for various orders by Petrone.

When Yale Med received the hardware from vendors, Petrone did not distribute them to Yale users.  Instead, she arranged to ship the hardware, via FedEx or other interstate carrier, to an out-of-state reseller in exchange for money, or to a third party at the instruction of the reseller.  In many cases, Petrone's customer placed orders with Petrone via email for the same type of computer equipment that Petrone purchased from Yale vendors.  In some cases, the reseller would provide FedEx labels to Petrone with the reseller listed as the sender and the recipient being another individual or company to whom the reseller was selling the equipment.  In other words, the reseller directed Petrone to ship the equipment directly to the reseller's end customer.  Petrone told the owner of one of her customers that she was able to use her affiliation with Yale to access educational discounts and overstock supplies of electronics, enabling her to sell equipment at a discount.

Petrone directed that payment be made from her customer into Maziv Entertainment LLC ("Maziv"), a company of which Petrone was a principal. Petrone spent the money out of Maziv bank accounts on personal expenses, as discussed below.

5

By way of example, as charged in Count One of the Information, on August 6, 2021, Petrone sent an e-mail from her Yale Med email account in Connecticut to an employee of a vendor outside of Connecticut in which Petrone requested a sales quote for 100 Surface Pro 7 detachable tablet computers with 256 gigabyte solid state drives, which she intended to resell to the out-of-state reseller for her own financial gain.  The vendor instructed a Yale staff member to submit 16 purchase orders for 6 Surface Pros each, and 1 purchase order for 4 Surface Pros, in order to keep each order below the $10,000 threshold.  On August 10, 2021, Petrone arranged for the purchase by Yale of those 100 Surface Pros in 17 different orders, and those computers were shipped by the vendor to Yale.  Yale paid approximately $144,822.38 for those 100 Surface Pros.  Also on August 10, a reseller emailed Petrone with the message:

> Contents:
>
> 100 X SP7 256gb i7 16g
>
> 150    iPad Air 64gb

Attached to the email were a series of FedEx labels that listed the sender as one of Petrone's customers, located in Michigan, and the recipient as an individual in Williston Park, New York.

Upon receipt by Yale, Petrone shipped the Surface Pros via Federal Express to the address in New York.  The customer paid Maziv approximately $90,000 for those Surface Pros; there are several payments between $86,600 and $95,500 from the customer to Maziv around the same time, all related to shipments of stolen Yale-purchased hardware.

6

Petrone's scheme was first reported by Yale to federal law enforcement on August 25, 2021, following an internal investigation.[1]  On August 26, the FBI lawfully seized merchandise from FedEx that, according to records and video surveillance, Petrone had shipped to New York as described above. The FBI then surveilled numerous boxes being loaded into Petrone's Range Rover, which Petrone delivered to the FedEx facility in Orange.  Law enforcement seized the boxes (94 individually packaged SurfacePro tablets) the following day from the FedEx facility, where they were slated to be delivered to the New York address. Petrone provided a voluntary statement to law enforcement in which she admitted to having devised and executed the above-referenced scheme and indicated that it had been going on for several years, possibly as many as ten years.  Petrone estimated that approximately 90% of her computer-related purchases were fraudulent.

The Government and Petrone have agreed that Petrone's conduct caused a total of $40,504,200.08 in loss to Yale Med as a result of the above scheme. Subsequent to the plea, Yale New Haven Hospital informed the Government that some of the money stolen from Yale Med was actually the hospital's.

The Government undertook to analyze Petrone's spending resulting from the offense.  In total, Petrone spent approximately $20,196,229.40 out of the Maziv

---

[1] A year prior, Petrone had lied in response to an inquiry by Yale into a budget variance and a high volume of computer equipment being purchased by her department. Petrone falsely responded to the inquiry that her department was updating their equipment and was also working with Yale New Haven Health on a new program.

PayPal account; a Maziv bank account at Bank of America; two personal bank accounts at Bank of America; and American Express cards in the name of Petrone, her husband (whose initials are J.C.), and/or Maziv Entertainment.   The Government attempted to categorize the spending, with the top 20 items as follows:[2]

| Category | Sum of Amount |
|---|---|
| Travel | ($4,199,253.95) |
| Entertainment | ($3,868,850.32) |
| Retail | ($2,574,584.56) |
| PayPal | ($1,485,387.57) |
| Purchase of home in Lithia Springs, GA | ($441,440.81) |
| Cash | ($400,725.20) |
| Personal Expenditures | ($388,547.57) |
| Contractor | ($383,165.65) |
| [Petrone's son, initials K.C.] | ($352,445.35) |
| Purchase of home at 47 Fawn Meadow Drive, Naugatuck | ($305,489.10) |
| Square | ($280,924.76) |
| Purchase of home at 825 Maple Hill Road, Naugatuck | ($258,599.89) |
| Transportation | ($214,883.78) |
| VENMO | ($187,684.24) |
| Security | ($175,584.59) |
| PEYMYNT Financial | ($149,894.32) |
| Household | ($149,398.51) |
| Purchase of 2017 Range Rover Autobiography | ($125,400.00) |
| Ambitiouz Beauty Bar | ($123,955.57) |
| Rodriguez | ($104,621.24) |

Notably, the PayPal category describes spending in a PayPal account for Petrone's son K.C. that is linked to Petrone's American Express card.  "Personal" includes various miscellaneous expenses, including personal grooming.

---

[2] The categorization was completed by looking only at items above $10,000, which captured 90% of the spending but omitted more than $2.3 million.  Thus, the true category numbers are likely slightly larger.

"Square" is an electronic payment system frequently used by small businesses such as restaurants.   Likewise, VENMO and PEYMYNT are both electronic payment services.  "Security" includes personal security for K.C.'s girlfriend, who is a rap artist. The Government believes that the payments to "Rodriguez" were to someone who provided personal services to Petrone.

Additionally, Petrone subscribed and filed a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for each of the years 2013, 2014, 2015, and 2016 with the Internal Revenue Service. Each return contained Petrone's declaration that it was made under penalty of perjury. Petrone did not believe the tax returns to be true and correct as to every material matter, specifically, Petrone substantially overstated cost of goods sold on Lines 4 and 42 of her Schedule C (Profit or Loss from Business).  Petrone reported the cost of the stolen hardware as if she had purchased it before resale, when in fact she had stolen them from Yale.  This caused a substantial underreporting of net profit on Line 31 of her Schedule C and business income on Line 12 of her Form 1040, which in turn caused a substantial underreporting of adjusted gross income on Line 37, Form 1040, and a substantial understatement of taxes due and owing on Line 78, form 1040. In so doing, Petrone acted willfully.

As charged in the Information, on February 27, 2017, in the District of Connecticut, Petrone willfully made and subscribed a United States Individual Tax Return, Form 1040 (together with associated schedules), for the year ending December 31, 2016 (the "2016 Form 1040), which was verified by a written declaration that it was made under the penalties of perjury and which Petrone did

not believe to be true and correct as to every material matter.  The 2016 Form 1040, which was filed with the Internal Revenue Service, materially overstated Petrone's cost of goods sold on Lines 4 and 42 of Schedule C.

Petrone did not file tax returns for the years ending 2017, 2018, 2019, and 2020, and in failing to do so, did not pay any tax due and owing by her to the Internal Revenue Service, to include money received as a result of the above scheme and artifice.

The Government and defendant agree that the following are the tax due and owing for each of the years 2013 through 2020:

| Tax Year | Additional Tax Due and Owing |
|----------|------------------------------|
| 2013 | $82,825.00 |
| 2014 | $201,785.00 |
| 2015 | $290,114.00 |
| 2016 | $383,407.00 |
| 2017 | $1,246,159.00 |
| 2018 | $1,039,318.00 |
| 2019 | $1,551,493.00 |
| 2020 | $1,621,517.00 |
| Total | $6,416,618.00 |

## II.   Sentencing Guidelines

The Government stands by the Guidelines calculation in the plea agreement, as follows:

The parties agree that the counts are grouped together under Section 3D1.2(d) into a single group because the offense levels are determined largely on the basis of the total amount of harm or loss. *See United States v. Gordon*, 291 F.3d 181, 189 (2d Cir. 2002); U.S.S.G. § 3D1.3. The figure used to compute the adjusted offense levels under the applicable sections of the Guidelines is obtained by

combining the losses due to the wire fraud offense as well as the tax fraud loss. The parties further agree that the Guideline calculation under U.S.S.G. § 2B1.1 for the offense of wire fraud, as charged in Count One of the Information, produces a higher offense level than the Guideline calculation under U.S.S.G. § 2T1.1 for the offense of false tax return, as charged in Count Two of the Information. As a result, U.S.S.G. § 2B1.1 is used to determine the applicable Guidelines range. U.S.S.G. § 3D1.3(b).

Petrone's base offense level under U.S.S.G. § 2B1.1(a)(1) is 7.  That level is increased by 22 because the loss is greater than $25 million but less than $65 million.  U.S.S.G. § 2B1.1(b)(1)(L).  The level is further increased by 2 because the offense involved sophisticated means and Petrone intentionally engaged in or caused the conduct constituting sophisticated means. U.S.S.G. § 2B1.1(b)(10)(C). The level is further increased by 2 because Petrone abused a position of private trust in a manner that significantly facilitated the commission and concealment of the offense, U.S.S.G. § 3B1.3, resulting in an adjusted offense level of 33.  Three levels are subtracted under U.S.S.G. § 3E1.1 for acceptance of responsibility, as noted above, resulting in a total offense level of 30.

Based on an initial assessment, the parties agree that Petrone falls within Criminal History Category I.  The parties reserve the right to recalculate Petrone's Criminal History Category and corresponding sentencing ranges if this initial assessment proves inaccurate.[3]

---

[3] No such recalculation appears necessary here.

A total offense level 30, assuming a Criminal History Category I, would result in a range of 97 to 121 months of imprisonment (sentencing table) and a fine range of $30,000 to $300,000, U.S.S.G. § 5E1.2(c)(3).   Petrone is also subject to a supervised release term of 1 to 3 years.  U.S.S.G. § 5D1.2.

III.   <u>Sentencing Factors</u>

Consideration of the Guidelines and the statutory factors in 18 U.S.C. § 3553(a)(2) demonstrate that this is a serious crime warranting a Guidelines term of imprisonment, even in light of the history and characteristics of this defendant, *see* 18 U.S.C. § 3553(a)(1).

A.  <u>Seriousness of the Offense, Respect for the Law, and Just Punishment</u>

By far the most significant consideration that calls for a substantial punishment in this case is the seriousness of the offense.  This case was not a momentary lapse in judgement, but a sustained, years-long scheme to steal tens of millions of dollars.  Several factors in particular augur for a Guidelines sentence.

*First*, Petrone's crime was one of simple greed and selfishness, rather than an act of financial need.  Petrone was first hired by Yale New Haven Hospital in 1999 as a temporary receptionist while still in school, and shortly afterwards was made a full-time employee earning approximately $35,000 annually. PSR ¶ 85. Petrone was quickly promoted to senior administrative assistant.  In 2008, Petrone transferred from the hospital to Yale University, where she was employed by the Department of Emergency Medicine.   PSR ¶ 86.   From there, she was again promoted through the ranks, culminating in 2019 with her appointment as Director of Finance and Administration for the Department of Emergency Medicine, earning

$115,000 per year.  PSR ¶ 86.  In short, Petrone was consistently treated fairly by Yale, and was consistently given more responsibility and more money commensurate with her years of what appeared to be loyal service.  Given her six-figure salary and two decades of stable employment, Petrone's crime was clearly not borne of financial necessity, but was perpetrated despite otherwise being financially successful.  Indeed, the pace of her crime increased over time, even as Yale continued to increase her salary.

*Second*, Petrone's crime betrayed the significant loyalty Yale showed towards her over her twenty-year career, through both increasing her responsibility as well as her compensation. As Dr. Andrew Ulrich, Interim Chair of Yale's Emergency Department observed, "By the time she was promoted to lead administrator, she had become a member of the family. The fact that Ms. Petrone spent half her Yale career stealing resources intended for the department's mission was a brutal betrayal of the trust her colleagues and mentors placed in her."  Victim Impact Statement of Dr. Andrew Ulrich, M.D. ("Ulrich Statement") at 2. And Petrone did not just violate that trust by stealing.  She also used the people who trusted her—both supervisor and subordinate—as unwitting accomplices, including by enlisting employees to place the fraudulent orders and then carry the equipment to her car (from where she would them ship them to a reseller).  This did not happen on isolated occasions, but repeatedly over years as Petrone placed hundreds of fraudulent orders and re-sold countless pieces of computer equipment that she claimed to her colleagues were for the support of Yale medical professionals.  Dr. Ulrich observed that Petrone's "greed and deceit blew a hole in the morale of a

13

department that survives on morale, and it will take a great deal of time to repair that damage." Ulrich Statement at 2.  Indeed, Petrone's betrayal has taken a personal and professional toll on those she used.  *See* Victim Impact Statement of Donna Nemeth ("Nemeth Statement").

*Third*, Petrone well knew that she was stealing funds that were otherwise designated to serve the mission of the Yale Medical School and Yale New Haven Hospital, that is, to care for patients, train physicians, and advance critical research. Dr. Ulrich explains that three-quarters of the Emergency Department's patients are Medicare or Medicaid recipients and thus are "overwhelmingly…the aged and the needy." Ulrich Statement at 1.  Petrone's use of Yale funds to take lavish trips and buy fancy homes and cars stands in stark contrast to the intended use of that money.  Worse yet, as lead administrator, Petrone had direct insight into how the money she stole should have been used, that is, for patient care and research.

Nor was Petrone's theft a drop in the Emergency Department's bucket. Nearly $25.5 million of the $40 million she stole came between fiscal years 2019 and 2022.  By comparison, the Emergency Department's 2021 grants from the National Institute of Health were just under $18.2 million, which was a significant increase over prior years. *See* "Yale Emergency Medicine Ranks First for NIH Grants Funding According to National Report," Yale School of Medicine, available at https://medicine.yale.edu/news-article/yale-emergency-medicine-ranks-first-for-nih-grants-funding-according-to-national-report/ (last accessed October 4, 2022). Even as Yale physicians were working hard to bring in money to conduct their

14

research, Petrone was at the same time moving a substantial portion of that money out the back door and into her own pockets. Moreover, Petrone's theft also victimized Yale New Haven Hospital, which provided funding to Yale's Emergency Department based on an assessment of its financial status significantly skewed by Petrone's theft. *See* Victim Impact Statement of Michael Holmes, Executive Vice President and COO of Yale New Haven Hospital ("Holmes Statement") at 1.

*Fourth*, the sheer magnitude of both Petrone's theft and her wasteful spending is itself deserving of significant punishment. The scale of Petrone's spending was particularly shocking, and unique among cases in this District. It included more than $4 million in travel expenses, just under $4 million in entertainment (including over $1.1 million to StubHub, a ticket vendor), more than $2.5 million in retail expenses (including more than $200,000 to luxury retailer Saks Fifth Avenue), and more than a million dollars in properties and luxury cars.

*Fifth*, the seriousness and impact of Petrone's conduct was exacerbated by the COVID-19 pandemic when, despite the stress and burden placed on medical professionals, Petrone further ramped up her fraud scheme. *See* Ulrich Statement at 2 ("The fact that she enormously accelerated her theft during the COVID pandemic, when her colleagues were working tirelessly and at great risk to their own health, was unspeakably cynical."); *see also* Holmes Statement at 1 ("although Ms. Petrone stole $40.5 million over an eight-year period, more than half her theft--$23 million—occurred in 2020 or later during the height of the Covid epidemic").

15

### B. Adequate Deterrence and Protection of the Public

It seems unlikely that Petrone is a significant risk to reoffend. At a minimum, Petrone's conviction here will make it less likely (though, based on experience, not impossible) that another employer would trust Petrone in the way that Yale did. Thus, she is unlikely to be in a position to steal from another employer on the same scale she did here.  That said, the extent and duration of Petrone's crime points to a serious flaw in her own moral and ethical calculus that will not heal quickly, nor without significant sanction from the Court.  Even now, the Government has significant concern with Petrone's delay in surrendering the cars that she agreed to forfeit as part of the plea agreement. Following are the six cars that she agreed to surrender, along with the date of surrender, if any:[4]

| Description | Date of Surrender |
|---|---|
| A 2017 Red Land Rover/Range Rover Sv Autobiography, Connecticut License Plate: AX16523, VIN: SALGW3FE6HA351155 | 9/16/2021 |
| 2015 Black Cadillac Escalade Premium, Connecticut License Plate: AM07678, VIN: 1GYS4CKJ4FR268634 | 9/16/2021 |
| 2014 White Mercedes-Benz G550, Connecticut License Plate AR92404, Vehicle Identification Number WDCYC3HF1EX224164 | 4/4/2022 |

[4] On September 17, 2021, Petrone also surrendered a 2013 Audi A6 Premium Plus, but that car had no equity and so is not the subject of any forfeiture proceeding.

16

| Description | Date of Surrender |
|---|---|
| 2020 Cardinal Red Mercedes Benz Model E450A, Georgia License Plate: CQB4322, VIN: WDD1K6HB8LF125147 | 4/4/2022 |
| 2016 White Cadillac Escalade (4 Door Sport), California License Plate: 8XFU511, VIN: 1GYS4DKJ8GR294158 | Not surrendered |
| 2018 Dodge Charger, California License Plate: 8AUC527, VIN: 2C3CDZFJ4JH120648 | Not surrendered |

Petrone was first arrested on a complaint on September 3, 2021.  It took almost two weeks for her to surrender the first three cars that were traced to her offense, including one that turned out to have no equity.  More alarming, it took more than six months for her to surrender the next two cars (both Mercedes), which were finally given to the FBI on in April 2022.  Her delay was despite repeated warnings from the Government that it viewed a failure to produce the vehicles as evidence of a lack of contrition and appreciation of the seriousness of her conduct. And the remaining two cars, believed to be in the possession of her son, are still unaccounted for, despite several attempts by the Government to arrange for their production. In short, Petrone's delay in producing the luxury vehicles that she bought with criminal proceeds suggests that she still has far to go before the Court can credit her desire for "rebuilding on a foundational level," PSR ¶ 82.

Moreover, even if specific deterrence is not a significant consideration, the Court should strongly consider general deterrence.  Fraud by organizational

insiders is particularly insidious. Organizations, particularly non-profit organizations, must be able to delegate authority to trusted employees in order to exist, and they must be assured that society with deal seriously with violations of that trust. This is particularly true in health care, where "[t]he physicians, nurses, and P.A.s, who spend their days and nights caring for patients, teaching trainees, and expanding medical knowledge, must be able to rely on dedicated staff members for crucial administrative support." Ulrich Statement at 1.

    C. <u>History and Characteristics of the Defendant</u>

    In her sentencing memorandum, Petrone suggests that she should be spared a lengthy prison sentence because of her desire to make amends and her need to care for a child who, she says, has physical and mental health issues. However, these concerns do not suggest a home-confinement sentence, as Petrone argues.

    *First*, as discussed above, Petrone's interest in atoning for her bad decisions, Def. Sen. Mem. at 9, is aspirational at this point. Given the length and extent of her criminal activities, the Court should treat with skepticism any claims of remorse. Petrone will have ample time to demonstrate true contrition after she is sentenced. Petrone took an important first step in that process through her willingness to sit for an interview with Yale and hospital personnel as part of their internal review, after Petrone's plea but before sentencing. Petrone answered questions regarding her conduct and how she was able to carry out her crime for so long.

*Second*, Petrone provides very little detail regarding her child's health concerns, and why her husband would not be able to provide adequate care during a period of incarceration.  According to Petrone, her son can be hospitalized if he catches even the common cold.  PSR ¶ 77, Def. Sen. Mem. at 7.  But her son has been a significant recipient of Petrone's fraud-financed largesse over the last several years, including accompanying Petrone on numerous domestic and international trips.  Likewise, her husband has similarly benefitted from fraud proceeds, living in fraud-funded houses, driving fancy cars, and buying expensive jewelry, among other things. Attached to this memorandum are four sealed exhibits of publicly available Facebook and Instragram posts picturing Petrone, her husband, and her son enjoying the life that Petrone's thefts afforded them.  *See* Exhibits 1-4.  In fact, it appears that at least some of Petrone's stolen money was used to promote a musical career for her son.  *See* Sealed Exhibit 5.  In short, while the Government agrees that it will be a hardship for Petrone's son to live without his mother for any period of time, and that the Court should consider that fact, any hardship occasioned by the sentence is a function of Petrone's own bad choices.

## IV.   Responses to Defense Arguments

In addition to familial circumstances, as discussed above, Petrone's principal appeal for a non-Guidelines sentence is based on the oft-repeated refrain that the fraud Guidelines over-emphasize loss and are not empirically sound, and thus should be discounted. Def. Sen. Mem. at 11-13.  These arguments fail because the fraud Guidelines are, in fact, the result of careful consideration by the

Sentencing Commission, and there is nothing in this case that suggests loss is an inappropriate measure of the seriousness of the crime.

*First*, contrary to Petrone's claim, the fraud Guidelines were established after long study and careful consideration.  § 2B1.1 and its loss enhancements were not the result of Congressional directive, and thus differ from the crack cocaine Guidelines criticized by the Supreme Court in *Kimbrough v. United States*, 552 U.S. 85, 109 (2007), or the child pornography Guidelines at issue in *United States v. Dorvee*, 616 F.3d 174, 183-84 (2d Cir. 2010).  Between 1996 and 2001, the Sentencing Commission gathered information, held hearings, and created an amended theft and fraud guidelines regime remedying deficiencies that had come to light in the prior version.  *See* Frank O. Bowman, III, *The 2001 Federal Economic Crime Sentencing Reforms: An Analysis and Legislative History* (hereinafter "*Economic Crime*"), 35 Ind. L. Rev. 5, 7-8 (2001).  What emerged was a complete overhaul of the Guidelines' treatment of white-collar crime, including by consolidating § 2B1.1 and § 2F1.1, revising the loss table to afford higher punishments for high-loss offenders and lower punishments for low-loss offenders, and redefining the term "loss" to avoid prior ambiguity.  *Id.* at 26.  These changes were meant to respond to complaints "from the Department of Justice, the Criminal Law Committee of the Judicial Conference, and others, that the offenses sentenced under the guidelines…*under-punish* individuals involved with moderate and high loss amounts, relative to penalty levels for offenses of similar seriousness sentenced under other guidelines."  U.S.S.G. Appx. C, Am. 617 (emphasis added).  Thus, the modern form of § 2B1.1 reflects the considered view of the Commission following

a collaborative process with relevant stakeholders that loss amount should be a central consideration in determining the seriousness of an offense.[5]

Second, reliance on *United States v. Litvak*, and by extension *United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013) is misplaced. In *Corsey*, Judge Underhill (sitting by designation) wrote a concurring opinion to express the views that § 2B1.1 was "not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices" and its use of loss enhancements is "fundamentally flawed." *Corsey*, 723 F.3d at 377, 379. Notably, however, the Court's *per curiam* decision did not mention such policy disagreements with § 2B1.1. In fact, the Court recognized that § 2B1.1 already properly accounts for situations in which loss substantially overstates the serious of the offense—as in *Corsey*, where the enormous intended loss was never likely. *See id.* at 377 (citing U.S.S.G. § 2B1.1, application note 19(c)). Moreover, despite Judge Underhill's strong disagreement with the Sentencing Commission's treatment of economic crimes in § 2B1.1, he merely prescribed that "district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides." *Corsey*, 723 F.3d at 379 (concurrence). This is true in every post-*Booker* sentencing, and "[a]ssuming arguendo that some judges have chosen as a policy matter not to sentence white collar criminals to the harshest permissible punishments, this does not entitle other white-collar criminals to lighter punishments than are reasonable under the

---

[5] Subsequent amendment to § 2B1.1 under the Sarbanes-Oxley Act did not address the loss enhancement for amounts less than $200 million.

Guidelines, 18 U.S.C. § 3553(a), and the totality of the circumstances of their individual case." *United States v. Goffer*, 721 F.3d 113, 131 (2d Cir. 2013).

Third, there is nothing about the facts of this case that suggest loss ineffectively measures the seriousness of the crime.  This is not a conspiracy in which other offenders received disproportionate amounts of the proceeds. Petrone was the sole perpetrator with criminal knowledge, and she—or her family and friends—received and benefitted from all of the proceeds.  Nor is this a case in which the Guidelines rely on unrealized intended loss; Yale suffered the entirety of the Guidelines loss.  While Petrone did not receive the benefit dollar-for-dollar of all $40 million of the stolen equipment, she spent more than $20 million of the proceeds after disposing of the equipment to resellers.  Combining just the amount she spent with the tax loss *still* places the loss above $25 million, and thus in the same Guidelines range.  And Petrone's suggestion that she should somehow be spared punishment because she did not steal from "vulnerable people" is not well taken.  If seriousness is measured by the type of victim, then Petrone's theft from an emergency department in the middle of a pandemic is perhaps of equal, if not greater, impact than if she stole from a "vulnerable person."  Moreover, if she had stolen from a vulnerable person, an additional guidelines enhancement would apply; no such enhancement applies here.  If anything, reliance on the Guidelines, through the loss, sophisticated means, and the abuse-of-trust enhancements, does not capture the seriousness of Petrone's shockingly wasteful spending of Yale's

money that would otherwise be used to care for the underprivileged and do critical medical research.

## V.     Restitution and Forfeiture

The Court should order the agreed-upon restitution of $40,504,200.08 to Yale University and $6,416,618.00 to the United States Treasury (IRS).

The Government requests that the Court issue a final order of forfeiture for the property contemplated in the plea agreement. The Government expects to seek to restore the proceeds from the forfeited assets for purposes of restitution.

## VI.    Conclusion

For the reasons stated above, the Government urges the Court to sentence the defendant to a term of imprisonment within the 97-121 months Guidelines range.

Respectfully Submitted,

VANESSA ROBERTS AVERY
UNITED STATES ATTORNEY

/s/

DAVID E. NOVICK
ASSISTANT U.S. ATTORNEY
157 Church St., 25th Floor
New Haven, Connecticut 06510
Tel. (203) 821-3700
Federal Bar No. phv02874

## CERTIFICATE OF SERVICE

   This is to certify that on October 7, 2022, a copy of the foregoing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

       /s/

       _____
       **DAVID E. NOVICK**
       **ASSISTANT UNITED STATES ATTORNEY**

**24**